and Mr. Lampkin whenever you're ready. Thank you and may please the court. This case fundamentally is about which regulatory structure governs when rain and groundwater percolate through stored coal ash. We think the answer for three reasons is the one that the Virginia DEQ has consistently given, and that is that RCRA and the state's solid waste laws govern, not the Clean Water Act. First, the Clean Water Act is limited to discharges from point sources. Stored coal ash is not a point source because it's not a conveyance. It's not something that directs pollutants from one location to another. Second, RCRA provides robust and calibrated protections specifically directed at leachate contamination of groundwater, specifically singles that out. Clean Diffuse Groundwater because it's a system of effluent limitations that look at the concentration, the quality of the content of water that's moving, such as out the end of the pipe where you can measure it. And third, superimposing the Clean Water Act here actually threatens the application of RCRA because RCRA excludes industrial discharges that qualify as point sources under the Clean Water Act. So beginning with the point source issue, the definition of point source limits point sources to conveyances. Conveyances means things that transport. Can you pull the microphone a little closer? Yes. I think I'm going deaf. Is that better? I want to make sure I hear what everybody says. It limits it to point sources. Point sources are defined to be conveyances. Conveyances are things that move pollutants from one location to another, directing them. For example, all the examples do that. For example, pipes, conduits, ditches, tunnels. These are all things that transport. No one claims that groundwater is a conveyance or a point source. That's because, as this court has explained, free-running surface waters, unchanneled, uncollected waters aren't point sources. And so the district court and the Sierra Club have pointed to the coal ash piles and said the coal ash piles are the conveyances. But coal ash piles aren't conveyances because they don't transport or channel pollutants. They don't move them or direct them from one location to another. They're not ditches. They're not channels. They are not tunnels. They are piles. And how does a concentrated animal feeding operation fit into your definition? Yes. So I think a concentrated animal feeding operation can be a conveyance where it has the effect of moving pollutants from one location to another. And the example is... How does it do that? How does it have the effect of moving them? Yeah. So there's two ways in which that can happen. One is, at least for mid-sized CAFOs or concentrated animal feeding operations, the EPA regulations talk about having a stream or other body that moves through it and collects up the manure and animal waste and sets it up for an outfall. And the legislative history has a specific back and forth. I think it's set on page 54 of our brief where one of the judges, or excuse me, one of the legislatures asks, hey, is it clear that, you know, you're only a CAFO, you're only covered by... You're only a conveyance if there's a specific outfall, a specific point where you're discharging, where the animal waste are coming out. How would Congress have needed to use those terms, concentrated animal feeding operation? Why wouldn't what you've described fit into the other terms that are used? Some of the categories are overlapping, but they made it absolutely clear that a concentrated animal feeding operation is sufficiently confined and discrete in order to be a point source, if it actually is a conveyance. But if it's not a conveyance, it doesn't qualify. For example, if Congress passed a statute that talked about U.S.-built automobiles, including trucks and motorcycles, you wouldn't say, oh, that includes foreign trucks and motorcycles. You'd still be saying it's U.S.-built. So when Congress writes a statute that talks about conveyances, including, and it has a list of things that have the capacity to transport, that including clause doesn't expand it beyond conveyances. These are just things that count when they are conveyances. So, for example, when you look at... One example would be on this site. We actually have what we call the bottom sedimentation pond. And that bottom sedimentation pond collects up leachate and moves it through a permitted outfall. That transports pollutants. And therefore, it is permitted. It's under the Clean Water Act and it's covered. But if you have something that's static and merely is the source of the pollutants, it isn't a conveyance because it's not moving from one place to another. And it's really interesting to look at the statutory text and carefully delve into it because every one of the listed examples is something that's capable of moving a pollutant. None of them are the pollution-splitting substance itself. If Congress had meant to cover things like solid waste as a point source, it wouldn't have just said tunnels, conduits, ditches, canals, things that move things. It would have had to add piles. It would have to have mounds. It would add houses. It would add all these stationary things that if loose water... Are RCRA and the Clean Water Act mutually exclusive? Could they both apply to the same coal ash impoundment? In this case, we don't think so, no. And there's a specific reason. RCRA has an exclusion... Just hold the mic a little closer. You're speaking a little low. Okay, my apologies. So RCRA has an exclusion from the definition of solid waste. And that exclusion from the definition of solid waste says that it does not cover industrial discharges, which are point sources subject to permits under the CWA. So if you define your coal ash piles as the point source, you're excluding from RCRA. And that actually has serious costs here because if you compare the way RCRA works and the way the Clean Water Act works, RCRA is actually much better adapted. It's much more rigorous. For example, the limit for groundwater under RCRA is 10 micrograms per milliliter. The surface water standard applied here is 36 micrograms per milliliter. RCRA is more rigorous. RCRA in Section 6942C specifically talks about leachate contamination. It specifically talks about addressing its impact on groundwater and surface water. Clean Water Act doesn't talk about that at all. And the Clean Water Act doesn't talk about it because the Clean Water Act isn't focused on diffused groundwater movements through solid waste. This Court's decision in Appalachian Coal actually makes that very clear, that it just doesn't cover when you have diffused water moving through solid waste. In Appalachian Coal, or excuse me, it's Appalachian Power versus Train. In that case, EPA had enacted regulations that purported to cover the situation where rainwater moves through stored materials and washes downstream and eventually reaches navigable waters. This Court held that the EPA couldn't do it because there wasn't a point source. The waters were uncollected and unchanneled. The Court said uncollected and unchanneled waters are not point sources. Well, if uncollected, unchanneled surface waters aren't point sources, even though they pick up pollutants as they go through stored materials, then a for sure underground, unchanneled, diffused groundwater that happens to pick up pollutants as it passes through solid waste isn't either. I just don't think consistent with Appalachian Coal, excuse me, Appalachian Power, this Court could hold that these coal ash piles are point sources. There's another case from the Ninth Circuit that's even closer to the situation here, which is Greater Yellowstone. And Greater Yellowstone involved a situation where rainwater was permeating through a membrane cover and getting into storage pits from waste mine rock. And the water, as it washed over the waste mine rock, would pick up bits of pollutants and then wash through and eventually get into groundwater, ground into navigable waters. And the Ninth Circuit held that that doesn't count. It's not a point source because the pit and the waste mine rock isn't channeling and collecting the waters in any way, shape, or form. The same thing is true of the coal ash here. It's just not a point source. So finally, I'd like to point to turn for one moment, and that is to the issue of whether the coverage of navigable waters and whether it extends at all to situations where you have groundwater pollution. And we think that Congress was very clear, and Congress made its considered decision. It looked at the issue of groundwater and it said, we're not going to cover groundwater. And the legislative history on that could not be more clear. And they gave two reasons for that. The first is, jurisdictionally, groundwaters are ubiquitous. They're everywhere. And they're ubiquitously connected to surface waters. So if we covered grout discharges that hit groundwater, we're basically taking away land use control from the states. And Congress did not want to do that. And the second reason was a technological reason. The states had to come up with various ways of addressing things like leachate contamination and groundwater contamination. And Congress was, at that point, looking at effluent limitations.  The flow rate of the liquid. And Congress wasn't sure that it made any sense to use effluent limitations for diffuse groundwater, where it could be migrating in any particular direction at any rate. In this case, it's a perfect example. We have rainwater and groundwater entering at no particular point. We have it going and staying for no particular period of time, exiting the coal ash at no particular point, and entering the river at no particular identifiable point. For that, it doesn't really make much sense to use effluent limitations. And Congress was actually very concerned about that. And so it held back and said, we're not going to cover groundwaters. Adding groundwaters, just because they may be, quote, hydrologically connected to surface waters, simply undoes Congress's work. But it also undoes it in a way that doesn't address Congress's concerns. It doesn't address the fact that you're basically displacing state land use regulation because surface waters and groundwaters are ubiquitously connected. And it doesn't undo the fact that Congress had a technological concern, that it really wasn't sure that effluent standards made sense for things like diffuse groundwater movements. And in fact, when Congress finally did turn to the issue again and enacted regulation, excuse me, enacted a statute to address specifically the question about solid waste and groundwater, and this is RCRA, it didn't go to effluent standards. It went to structural standards. It went to corrective action plans. It went to things other than effluent limitations. And finally, when Congress in 2016 turned specifically to the issue of coal combustion residuals, coal ash, coal waste from power plants, it amended RCRA. And it adopted the EPA's approach to addressing coal combustion residuals, addressing them as solid waste, not as Clean Water Act issues. So for all those reasons, we think the district court simply erred in attempting to move the Clean Water Act into a place where it doesn't belong, an area where RCRA and the state agency more than adequately handle, in fact, better handle the waste issue. There are no further questions. I'll reserve the remainder of my time for about a minute. All right. Thank you, Mr. Lang. Mr. Hallman. Your Honors, thank you. In this case, Dominion has disposed of coal ash, including 150 tons of arsenic, in an unlined pit in groundwater, sitting right beside a tidal river that flows to the Chesapeake Bay. And it is no surprise that that pit is discharging arsenic into the river. In seeking to reverse the district court's finding of a Clean Water Act violation, Dominion would have gotten the Clean Water Act contrary to the plain language of the statute, which is the basis of our case, the congressional purpose, and the overwhelming weight of authorities. Where in the plain language of the statute does it say that the Clean Water Act applies to groundwater? It does not say that, Your Honor, but what it says is this. It says the term discharge of a pollutant means any addition of any pollutant to navigable waters from any point source. It does not say directly to, and it does not say by a point source. And the overwhelming weight of authority- Is groundwater a point source? No, it is not. The point source, in this instance, there are three. It's the unlined pit, the bottom ash pond, and the landfill, because they are all discharging arsenic to the river via groundwater. It's flowing with the groundwater. You would call the groundwater discernible, confined, and discrete conveyance? No, Your Honor. Well, that's what's required under the Clean Water Act. The point source here is the pit. I understand, but the pit, a point source has to be a conveyance. It only now may use. The way the Congress defined, in terms of the point source issue, the way the Congress defined what conveyance means in this context includes, and it's not just includes, but is not limited to any container, any CAFO, confined animal feeding operation, any rolling stock from which pollutants are or may be discharged. So it does not require a pipe. If this were the law under the Clean Water Act, any polluter could move- From the language, it requires a pipe, but it requires a conveyance. The notion, those are examples of conveyance, but the statutory definition, the classification that's defined is a discernible, confined, and discrete conveyance. And they make that distinction different from the diffusion of the water through groundwater, through- Your Honor, when Congress defined what it meant by conveyance, it said it included, but was not limited to, a container. And a container doesn't- It can be a conveyance, or a container may not be a conveyance. Container may not pour anything into anywhere. Well- But the point is, it includes a conveyance. If it functions as a conveyance, then a container is a conveyance. Your Honor, if that were true, any polluter in America could pull its discharge into any waterway, five feet, ten feet, a hundred feet, a thousand feet back from the water source, we'd say there's no conveyance to the water. But that would gut the act. Depends on the circumstance of each case, but there are two different schemes. And this statute uses the word groundwater in other circumstances to make a clear distinction that this was not intended to regulate groundwater. Well, Your Honor, in the definition of point source, it also includes wells. A well is not a conveyance. A well doesn't move. Excuse me, why isn't RCRA the more applicable statute here? Because here we are challenging the violation of a permit issued under the Clean Water Act, and the addition of a pollutant to a navigable water, that is the Elizabeth River. So you think that RCRA doesn't apply at all here? RCRA also applies, but Congress and the EPA, when it adopted the coal combustion... Do you agree with opposing counsel that he said that RCRA is actually a more rigorous statute, more rigorous standards apply? Do you agree with that? No, I do not, Your Honor, for this purpose in this case. There's several reasons why that's not correct. First of all, RCRA does not govern discharges to navigable waters. That's what we are addressing. The discharge of arsenic to the Elizabeth River. First. Second, there is a permit officially issued in plain language under the Clean Water Act here, and it forbids Dominion from allowing the entrance of or to discharge any industrial waste or any waste removed during the course of this wastewater treatment facility into any surface water or into any groundwater. In other words... In addition, I can't figure out how you make that, because I thought the distinction of discharge into the navigable waters as opposed to discharge into the groundwater is basically written in plain language. I can explain. The way I make that distinction is that's the way the Clean Water Act permit is written. Not under the act itself, but the permit itself includes a provision that forbids the addition, the discharge of any industrial waste to any water of the state. And that includes both surface and groundwater. It uses... Well, that's what the state language is, but in using that language, it's parodying the Clean Water Act and its definitions. In other words, and the state regulators said that's exactly what we intended. They used the precise language of the Clean Water Act. Discharge to the Clean Water Act basically says the addition of any pollutant to the waters of the United States from any discoverable, discernible, confined, and discreet conveyance by any person is unlawful. And that's what the permit says. Now, the permit does, if you import state definition of waters of the state, that does include groundwater. But the state resolved that ambiguity and said, we enforce it under the Clean Water Act. There is no ambiguity. The permit says state waters. And it is undisputed that what state waters means in the state of Virginia includes both groundwater and surface water, both. And those permit provisions do not mimic the Clean Water Act. Is it within the state counterpart? In other words, under the state regulations, or is that a separate definition? That's under the law of the state of Virginia. I understand, but I'm talking about the state counterpart to the Clean Water Act. Yes. Is it in there? Yes. The definition under Virginia state water laws, groundwater is part of the water of the state. And this court has said, in U.S. v. Deaton, So the state regulators are wrong when they disagree with it? Yes, they are wrong in this instance. And in fact, this court said in U.S. v. Deaton, If the regulation is unambiguous, then what is known as Seminole Rock Deference does not apply in the regulation's plain language, not the agency's interpretation control. I think one thing that needs to be emphasized here, this is permitted as a wastewater treatment facility. They have a Clean Water Act. They got a Clean Water Act permit to control waste, to contain waste, to direct and control wastewater. That's what this whole permit is about. Is the Clean Water Act the only vehicle to seek remedy for this pollution? Yes, Your Honor. The Clean Water Act, and including the permit issued under the Clean Water Act, is a remedy for stopping the pollution of the navigable water. Why can't the REC Act be used? RCRA does not govern. First, RCRA does not govern discharges to navigable waters. That's what the Clean Water Act does. I'm asking you, why doesn't RCRA cover this site? I didn't say it didn't cover the site. I think it does cover the site. You just said the only regulation is only under the Clean Water Act. I understood the judge's question to be, can this issue we are addressing in this case be covered by another act? And the discharge to navigable waters is not, or surface waters under the permit provision, is not governed by RCRA. I know, but the issue in this case is whether it's a discharge to surface waters. And I think we'd have a different case as opposed to groundwater. And the groundwater is what the experts said was leaching into the navigable water, not from a discharge point. It was through the groundwater. And Judge Stackler's question was why, this is our ongoing question, why isn't RECLA the appropriate statute to regulate this? Well, the premise of this particular incident. If I could say, Your Honor, the premise of your question is the essential legal question that we disagree with. If the law were, which the law is not under the Clean Water Act, the discharge must be directly into the surface water. That the discharge, it doesn't use the word directly. No, it does not. Two. Correct. And there is no doubt that this is undisputed in the record. They didn't appeal from this. They did not appeal from the factual finding. And the factual finding of the judge is undisputed that this short distance from here, the unlined pit to the river, that arsenic is being discharged to the Elizabeth River from this point. Is the district court found, and it doesn't matter that it's a short distance or a long distance, they found that the discharge was going into the groundwater. And the groundwater was going into the river. And the question is, does the Clean Water Act cover when you have that intermediary transportation of groundwater as opposed to a discharge through a conveyance from the point? Correct. And I understand that's the point. And that's our point. Because if you were to take that position, if a court were to take that position, which courts have not, that would mean if a polluter moves its pipe, or its pit, or its container, 1, 2, 10, 50, 100 feet from the water source, the Clean Water Act will not apply. Let's move it a mile away. And they have a pipe, and it's pumping it all the way into a big cornfield. Real hard pollutants. That pollutant goes into the groundwater and gets into the river. That's not a Clean Water Act violation. That's a record violation. Well, I'm not sure. Most of the courts in the United States would not agree with what you just said, Neil, with the EPA. You think you can pump water into a cornfield. It seeps through the groundwater into the river. And you say that that is covered by the Clean Water Act? In many circumstances, the answer to your question is yes. And many courts have, virtually all courts, have so held. In other words, if I have a chemical plant, and I pump 10,000 gallons a day of arsenic into a field, and it runs from there into a river, that is a violation of the Clean Water Act. You're changing my hypothetical. I'm saying it goes into the groundwater. If it goes into the... It doesn't run in a ditch. It doesn't run in a creek. It goes into the groundwater. And you're saying that that's regulated. I just don't see that. Yes. In fact, that was a holding of the 9th... I don't see any case that's ever known. The 9th Circuit just held that. The 9th Circuit just held that. We submitted it to the court, the Hawaii Wildlife Fund case. We cited in our footnote, in our brief, probably not the weight of authority, the tonnage of authority. There are courts all across the United States which have held that contaminants transported by groundwater from a point source to a navigable water, which is what is happening here, violates the Clean Water Act. And Justice Scalia said that in Rapinos, and no justice disagreed with it. That is our position. And we believe that is what the clear language of the statute provides. There is no exception in the Clean Water Act for addition of a pollutant to a navigable water because the polluter has moved its pollution source back and allowed the pollution to run either above or under, or under the surface or through groundwater to the surface. I'm going to look at your case closely. I don't think the Supreme Court agrees with you, but I'm going to look at your case closely. I think there's a big distinction between flowing on the surface through ditches and creeks and going in the ground and seeping into the water. Well, that is exactly what the 9th Circuit held, and that's exactly what the 2nd Circuit held, and the Waterkeeper Alliance case. That's exactly what the 10th Circuit held in the Quivira case. And that's what the 7th Circuit held in the U.S. Steel case. We have a long line of district courts, including in this circuit, which have so held that groundwater, that pollution that is emitted from a point source here, a wastewater treatment facility, supposedly, a pit, unlined pit, that goes into the navigable, if the pollution is added to the navigable water from the point source, which the cases are legion that this kind of site is, then that is a violation of clean water. All right. Thank you. Yeah. Mr. Lamb. Thank you. Following the text of the Clean Water Act here and adhering to its limitations does not leave a gap in environmental protection. Could you speak up here? I apologize. Yeah. Yeah. And I apologize for that. Starting again. Obeying and adhering to the text of the Clean Water Act and its limitations, which require a point source and a discharge to navigable waters does not leave a gap in environmental protection here. Let me ask you this. We're dealing with the Clean Water Act. If my hypothetical for your colleague was if you pump gluten into a corn field and it goes into the ground water, not flows into the creek, goes into the ground water and leaches into a nearby stream from navigable waters, is that a Clean Water Act violation? He says clearly so. Yeah. And I think the answer is no. But there's two different pieces of it we'd have to look at. The first question is, do we have a point source? Yeah. And that's very different from this, our case, because we don't. We're not arguing our case. I want to understand some principles. Yes. And my hypothetical is intended to identify principles. Correct. That the ground water could or could not be a conveyance to the navigable waters. I think that, yes. His argument is it can't be. Your argument is it can't be, and I want to know why. And the answer is it can't be. And it's because Congress made a specific decision to exclude groundwater because that's just going to invade state land use regulation. And because it doesn't make sense to have effluent limitations, which look to how much water's coming through, what's its content, what is the concentration. Do these other courts agree with you that you cited? So the Hawaii case, I think, goes the other way against us in going through porous rock. But in that case, we did have a point source, and there was a well. And the well actually directed and conveyed the water down. And there was direct evidence in that case that that was happening. Yes, they did a dye study, and it showed that approximately 65% of all the, everything that went down into the well in terms of pollutants, and was conveyed downward for the very purpose of carrying it out, actually went down and made its way out to the ocean, to the navigable, or excuse me, to the territorial sea. But opposing counsel says that that's not the only case. There's tons of cases, and we would really be off the wall, apparently, to rule in your favor. No, on the navigable waters issue and the groundwater issue, I don't think that would be the case at all. The Fifth and the Seventh Circuits have gone directly our direction. The Fifth Circuit case, in a case called Rice versus Harkin, and the Seventh Circuit in a case called Village of Okonomowoc, it's hard to say, and in both of those cases, the courts essentially said, look, groundwater is off limits. And groundwater is off limits because Congress made a very specific decision. We are going to cover conveyances to navigable waters, but groundwater is jurisdictionally complex. It's an area for the states, and it doesn't necessarily make sense to take away all the power from the states and impose effluent limitations for groundwater, where you don't necessarily know where it's going in or how much is going in. You don't know where it's going after that. It exits at no particular point, and then it enters navigable waters at no particular point. It's extremely hard to use effluent limitations and come up with measurements for that. And that's why when Congress did address groundwater, and the statute is very clear on this, it says it went to RCRA and it used RCRA without going to effluent limitations. And I think the relevant language is actually pretty important because section 6942C1, and that's page 79 of our statutory appendix, tells the states to ensure the reasonable protection of the quality of the ground and surface waters from leachate contamination and then also surface runoff. And those are two things that Congress singled out in RCRA because they're not covered by the Lithuanian Water Act because you don't have a discrete conveyance. They just say you have diffuse movement of water, either through surface runoff as in Appalachian Power, or you have just diffuse movement through the ground as we have here. What about my hypothetical where there is a pipe pumping the pollution into the cornfield? The cornfield's not a wetland. It's just a cornfield. And they put it in there. Some scientists inside the plant said cornfields are good because they absorb some of this pollutant. It goes down, leaches down into the groundwater and gets into the nearby stream and ends up in navigable waters. Is that a violation of the Clean Water Act? Yeah, in our view, the answer is no. And it's not because of the absolute point source. You have a pipe in that case, which we don't have here. But the reason is because you're going to- The point source is not conveying it into navigable waters. That's right. It's conveying it into groundwaters. And now you have groundwaters intervening and groundwaters are jurisdictionally distinct and not within the Clean Water Act. That's what Congress did when it specifically rejected, including groundwaters, and the Fifth and Seventh Circuits has specifically rejected the notion that groundwaters, even if hydrologically connected, could somehow be within the jurisdiction of the Clean Water Act. Congress instead left that to the states under state land use law and to RCRA, which specifically has provisions addressing that type of leachate or other contaminations. It corresponds to Mr. Hallman's point that the state counterpart of the Clean Water Act, in this case, redefines the waters of the state to include groundwaters explicitly. Yeah, so there's two provisions at issue there. I'm just talking about the first. It actually refers to a discharge. And the regulations, the state regulations, have a definition of discharge. And it says that the discharge is a, comes from a point source to navigable waters. And so if you're looking for what was meant in the state permit, the regulations tell you that the state permit's talking about exactly the way the state interpreted it. A discharge from point source to navigable waters, precisely what this Federal Clean Water Act is talking about. In fact, the definition of a VPDES permit is a permit that allows us discharges from point sources to navigable waters. So it's well supported in the regulations, the state's interpretation, and our interpretation. In addition, frankly, it just doesn't make, would not make sense here to read that permit as extending beyond, because we already have two sets of permits. We have our solid waste permit, which is addressing everything that's going, leachate contamination, things like that. And you have a Clean Water Act permit. And they're addressing two different things. One addresses your outfalls to the water, where you have measurable quantities. And the other is addressing the storage of waste and leachate contamination. Does RCRA contain a citizen suit provision? It does. It has two subsections for a citizen suit provision. But Sierra Club did not address, did not go under RCRA here. And I have a suspicion why. I can only give you my suspicion. And that is that RCRA and the CCR rules, the Coal Combustion Residual rules in particular, have a preference for certain circumstances for leaving CCRs, Coal Combustion Residuals in place and treating them that way. And the sole remedy that Sierra Club wanted here was excavation. So I'm not sure RCRA would have gotten them the remedy they wanted. And I think for that reason, they decided to go with the Clean Water Act instead. The final, in the 20 seconds that remain, the last point I would make is that in order to proceed here, they'd have to have a, for the state violations, that would have to be actionable under the Clean Water Act citizen supervision. And it's not because it is not a discharge of an affluent with under section 1342. Thank you. On the cross appeal, I guess, Mr. Allman, you have some rebuttals, is that right? Yes, sir, Your Honor. Okay. Thank you. I'm not sure we addressed it much, but you're free to discuss it. Sure. And it's important here, because if Your Honor or anyone else has questions about whether the Clean Water Act on its face would reach this situation, you don't really have to reach that question. Because Dominion violated the terms of its own permit. And under the Clean Water Act, and under this court's rulings, and under the clear statement of the U.S. Supreme Court, a state can include in its Clean Water Act permit provisions that go beyond the requirements of the Clean Water Act. And this is what is in the permit. Now, these are conditions that are imposed in exchange for the privilege of operating a wastewater treatment plant. And as one district court in this district said, if you have a wastewater treatment plant, it cannot leak. And that's what these provisions say. First, provision F, which is cited in our brief in one of our claims, it says Dominion shall not discharge into state waters industrial waste, other waste, or any noxious or deleterious substances except through discharge point 002 or 001, the permitted point from the bottom ash pond or the sedimentation pond. And secondly, it says this, solids, sludges, or other pollutants removed in the course of treatment or management of pollutants, and that's what this pit was supposed to do, manage this coal ash and its arsenic, shall be disposed of in a manner so as to prevent, in other words, they have the burden to prevent any pollutant from such materials from entering state waters. Now, state waters, and it doesn't say point source or any of the things we've been debating, if you operate a wastewater treatment facility, you've got to keep the waste, the arsenic, the contaminants out of our rivers and our groundwater. That's what it says, that's their obligation. And that is what the judge found they had done. The judge made two mistakes. First, he forgot state waters obviously include navigable waters, surface waters, and we established that. The only issue we've been debating here is, is this a point source, is that a point source? Here, the permit says if you operate this facility, you have the obligation to prevent the stuff you put in this pit from making it into, entering into our waters. Doesn't have all that conveyance language we've been debating here. First. I thought those were conditions to the overall permit, which parrots the language of the Clean Water Act. It does not parrot the language of the Clean Water Act, Your Honor, it's very different. It doesn't use the term point source, it doesn't use the word conveyance. The overall permit, in other words, the initial portions of the permit talks about the discharge of waters from a point source. That this is a Clean Water Act permit that does say that. It does say what you said, but it is also, under established law, states can put in permit provisions that go beyond the terms of the Clean Water Act, and those are enforceable according to their plain language. And here, state waters definitely include navigable waters, we have to admit that. And by law, and the district judge found this, by law, state waters also include groundwater. And by not allowing these pollutants, including arsenic, they're supposed to remove and keep in the pit. By allowing those to enter into state waters, and by not preventing them from entering, they have violated these two permit provisions. And that really is the end of the, that is the violation. If you have any disagreement about the Clean Water Act, this permit provisions govern. They undertook to operate a wastewater treatment facility, and to have the privilege to discharge out of that through a specific outfall into a public waterway. In exchange for that, the permit says, very commonsensically, if you do that, you take this permit, you gotta keep that stuff in your pit. And that did not happen here. In fact, the court found the opposite. And I want to emphasize, they have appeal from the legal issues, they have not appealed from the judge's factual findings. And he found a direct hydrological connections. That is not an issue in the case, that there is direct and undisputed proof now, because it's not appealed from, that in fact, arsenic is coming from this pit, and going into the Elizabeth River. And the gravel. Okay, thank you. Thank you. We'll come down and brief counsel, take a short recess. The honorable court will take a short brief recess.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Stephanie D. Thacker